**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X

HEATHER M. PALMORE,                    :

                              :    Index No.

          Plaintiff,         :

                              :

     v.                              :    **COMPLAINT**

                              :

NAPOLI SHKOLNIK PLLC, PAUL NAPOLI,      :

MARIE NAPOLI, and HUNTER SHKOLNIK,      :    **Jury Trial Demanded**

                              :

          Defendants.        :

                              :

------------------------------------------------------------X

Plaintiff Heather Palmore alleges against Defendants Napoli Shkolnik PLLC (the "Firm"), Paul Napoli, Marie Napoli and Hunter Shkolnik as follows:

## PRELIMINARY STATEMENT

1.      Defendants' conduct is best described as "Brazen Bullying"—despite being lawyers bound to act with ethics and integrity, they are nothing more than boorish bullies who will stop at nothing and break the law to intimidate people who try to stand up to them.  In what can only be described as an act of obvious desperation, Defendants cobbled together lies and sued Ms. Palmore (see Napoli Shkolnik PLLC v. Heather Palmore, Index. No. To be Assigned (Sup. Ct., Nassau Cty.) (referred to hereafter as the "Napoli Preemptive Lawsuit")) only after she had raised claims of discrimination—towards herself and her colleagues—and days before, as they knew, a lawsuit was about to be filed against them.  Defendants' conduct is wholly repugnant and must be stopped immediately.

2.      Heather Palmore is the Chief Trial Counsel at the Firm, where she was recruited to work by its Partner, Paul Napoli.  Since joining the Firm, Ms. Palmore has been subjected to and witnessed egregious race and disability discrimination by senior management as part of their

1

standard operating procedures.  Ms. Palmore has had the courage to speak out against discrimination at the Firm and has been made to suffer for it, with the Napoli Preemptive Lawsuit filed against her being just the latest in an ongoing string of retaliatory acts.

3.      To say the Firm's treatment of Ms. Palmore since she made protected complaints of discrimination and requested medical leave has been horrific, hostile and blatantly unlawful would be an understatement.  Ms. Palmore raised these claims internally in mid/late 2022 and then through counsel in October 2022.  Ms. Palmore was about to file her lawsuit in December 2022, when the other side agreed to engage in mediation, which was ultimately held on January 12, 2023.

4.      At the mediation, the Firm stated that they wanted her to continue working at the Firm, offered Ms. Palmore hundreds of thousands of dollars (to resolve her discrimination claims) and begged Ms. Palmore to hold off filing her lawsuit in order for the parties to schedule a second mediation date.  But the whole process was a ruse intended to buy the Firm time to fabricate its own bogus lawsuit to file before Ms. Palmore could file her lawsuit—and gain some ill-conceived strategic advantage by filing first.  It was also intended to scare, intimidate and deter Ms. Palmore from proceeding with her claims and to punish her for speaking out about discrimination.

5.       As just one example of the egregious discriminatory conduct Ms. Palmore was subjected to, a stuffed bear was hung from a noose on a light fixture in direct view of her office. A Representative Example (from December 5, 2021) is shown here:



6.      But the Firm's lawsuit against her is so obviously bogus and frivolous.  It is an
abhorrent retaliatory measure taken by lawyers who have no care or concern for moral, ethical or
legal obligations.  The Firm's complaint against Ms. Palmore is laden with countless bald-faced
lies.  As just one example, the Firm alleges Ms. Palmore "took advantage of the new remote
work environment to 'quiet quit' her job."  However, as detailed further below, on October 20,
2022, just one day after the Firm received a representation letter from Ms. Palmore's counsel,
Ms. Palmore "lost" access to the Firm's network in its entirety as the Firm sought to interfere
with her ability to do her job.  It is devoid of logic to assert that Ms. Palmore could take
advantage of a remote work system that she did not have access to.  To make matters worse, the

Firm filed its frivolous lawsuit against Ms. Palmore to prey on her weakened state as the Firm was fully aware Ms. Palmore suffered serious health conditions and requested medical leave only days prior to the filing of its senseless lawsuit.

7.      Ms. Palmore has been and remains disgusted that a Firm which outwardly prides itself as being zealous advocates, treats its minority employees like second-class citizens and even staffs its cases based on gender preferences and bias.  Ms. Palmore had the courage to speak up and complain about the Firm's discriminatory conduct and complete lack of commitment to diversity, equity and inclusion, and she has been treated like a complete pariah and "enemy" of the Firm ever since, including "being harshly yelled at several times by Paul Napoli, horrifically harassed by senior leadership, threatened for salary reductions and directly told that she should "know better" than to file a complaint.  Moreover, Paul Napoli confirmed to Ms. Palmore, in writing, and before she even had an opportunity to describe the basis for her claims of discrimination, that he had already "disposed" of her claims and that he had already concluded that her claims were "spurious."  Clearly, the Firm made a conscious decision that after she filed her complaints, Ms. Palmore would be mistreated and harassed until she was forced out of the Firm.

8.      But Ms. Palmore is not the only person who has accused the Firm of discrimination and retaliation.  In fact, she is just one of several employees who have recently reported discrimination towards themselves and others.  But the Firm does not care.  Part of the Firm's goal in filing the Napoli Preemptive Lawsuit is to broadcast that those who raise claims will be publicly shamed and to send a message to all employees that they should keep their mouths shut.  Ms. Palmore will not stand by and allow this unlawful conduct.

9.      This is hardly the first time, nor will it be the last, when the Defendants have engaged in abhorrent, unethical and unlawful conduct towards employees.  As one example, a female attorney filed an action against Defendant Paul Napoli, Defendant Marie Napoli and their former firm, Napoli, Bern, Ripka Shkolnik, LLP, which alleged that Ms. Napoli embarked on an unrelenting campaign of harassment after Mr. Napoli pursued an extramarital affair (his wife is Defendant Marie Napoli) with the plaintiff while she was his subordinate.  See Dennis v. Napoli, 148 A.D.3d 446, 49 N.Y.S.3d 652 (2017) (Ms. Napoli also sent the plaintiff harassing messages calling her names such as "slut" and "hoe" for her Paul Napoli's conduct).[1]  As another example, a former employee of Mr. Napoli's and his prior Firm, Napoli, Kaiser, Bern, LLP, filed a wrongful termination action in which the plaintiff alleged that he was terminated because he refused to falsely attest to the genuineness of settlement documents which had been forged.  See Connolly v. Napoli, Kaiser & Bern, LLP, 34 Misc. 3d 1215(A), 946 N.Y.S.2d 66 (Sup. Ct. 2012).  Clearly Defendants have little care or concern for and pay no mind to any of their ethical or lawful obligations.

10.      Defendants' misconduct violates numerous laws, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, et seq. ("Section 1981"), the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq. ("ADA"), the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 et seq. ("FMLA"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-

---

[1]      See e.g. Vincent, Isabel, "Affair and Vengeful Wife Rip Apart 9/11 Law Firm," New York Post, (November 9, 2014), available at: https://nypost.com/2014/11/09/affair-and-vengeful-wife-rips-apart-911-law-firm/; Klein, Melissa, "9/11 Lawyer was Hellbent on Having Sex with Me," New York Post, (December 14, 2014), available at: https://nypost.com/2014/12/07/former-associate-says-her-lawyer-boss-refused-to-end-their-affair/

101 *et seq*. ("NYCHRL"), and the New York Labor Law, *N.Y.L.L. §215 et seq.* ("NYLL"); and

New York Civil Rights Law §76-a. ("NY Anti-SLAPP Law").

## JURISDICTION

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and

1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under

Section 1981.  The Court has supplemental jurisdiction over Plaintiff's related claims arising

under state laws pursuant to 28 U.S.C. § 1367(a).

12.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C.

§ 1391(b)(1) and (2) Defendants' residence; the Firm's principal place of business is in this

District, and because a substantial part of defendants' conduct giving rise to the factual

allegations contained herein occurred in this District.

## ADMINISTRATIVE PREREQUISITES

13.     Plaintiff will file a complaint with the Equal Employment Opportunity

Commission ("EEOC") alleging violation of Title VII and the ADA.  When the EEOC issues

Ms. Palmore a notice of right to sue or otherwise dismisses her charge, she will seek leave to

amend this Complaint to add claims under Title VII and the ADA.  Any and all other

prerequisites to the filing of this suit have been met.

14.     Contemporaneous with the commencement of this action, Plaintiff has filed a

Verified Complaint with the New York City Commission on Human Rights ("City

Commission").  Plaintiff reserves the right to withdraw her claims from the City Commission

and pursue her NYCHRL claims in court.

15.     Thus, any and all other prerequisites to the filing of this suit have been met.

## PARTIES

16.     Plaintiff Heather Palmore is an employee of Defendants, and she resides in Long Island, New York.  Ms. Palmore works out of the Firm's New York City and Long Island offices.

17.     Defendant Napoli Shkolnik is a domestic professional limited liability company with its principal place of business in New York County, New York.  At all relevant times through present, the Firm is and has been an "employer" of Plaintiff.

18.     Defendant Paul Napoli is a principal of the Firm.  At all relevant times through present, Mr. Napoli is and has been an "employer" of Plaintiff and has directly participated in the unlawful conduct described herein.

19.     Defendant Marie Napoli is a principal of the Firm.  At all relevant times through present, Ms. Napoli is and has been an "employer" of Plaintiff and has directly participated in the unlawful conduct described herein.

20.     Defendant Hunter Shkolnik is a principal of the Firm.  At all relevant times through present, Mr. Napoli is and has been an "employer" of Plaintiff and has directly participated in the unlawful conduct described herein.

## FACTUAL ALLEGATIONS

### I.     Ms. Palmore's Professional Background

21.     Ms. Palmore has amassed over two decades of extensive experience in various fields of law, including personal injury, wrongful death, labor law/construction, education law and civil rights matters.

22.     After graduating from Syracuse Law School in 1995, Ms. Palmore entered public service and worked as an Assistant District Attorney in Queens County, New York.  During her time there, she led the office in trials and convictions for two consecutive years.

23.     Thereafter, in 2000, Ms. Palmore joined Conway, Farrell, Curtin & Kelly, P.C. ("Conway Farrell") as an Associate.  By 2007, Ms. Palmore became a Partner and was Conway Farrell's "go-to" attorney on its high exposure cases.

24.     Since then, Ms. Palmore has worked at Nationwide Insurance and CNA Insurance as a Senior Trial Attorney.

25.     Ms. Palmore's most recent prior employment was at Quintarios, Prieto, Wood and Boyer LLP ("Quintarios Prieto"), where she was hired as a Partner.

26.     While at Quintarios Prieto, Ms. Palmore handled matters that received national attention, including one matter involving Jennifer McLeggan, an African American woman who was pervasively harassed for years by her neighbors in Valley Stream, New York.[2]

27.     At this point in time, Ms. Palmore had taken more than 150 cases through jury selection and approximately 100 to verdict, where she had never lost.

28.     In or around August 2021, prior to joining the Firm, Ms. Palmore was retained by the family of Jomani Wright to be lead counsel in Joseph Wright as Proposed Administrator of

---

[2]     See e.g. Hutchinson, Bill, "White Long Island Couple Charged Following Harassment Complaints by Black Neighbor", *ABC News*, (Aug. 19, 2020), available at: https://abcnews.go.com/US/white-long-island-couple-charged-harassment-complaints-black/story?id=72441328; Griffith, Janelle, "A Black woman says she was racially harassed for years. Police acted only after her story went viral", *NBC News*, (Oct. 28, 2020), available at https://www.nbcnews.com/news/us-news/black-woman-says-she-was-racially-harassed-years-police-acted-n1244220.

the Estate of Jomani Wright, Deceased, *et al.* v. Town of Hempstead, *et al.*; Index No. 614507/2021 (N.Y. Sup. Ct.), another high-profile matter.[3]

## II.      **Ms. Palmore gets Recruited to the Firm by Paul Napoli**

29.      It was in connection with the <u>Wright</u> matter that Ms. Palmore was first introduced to Mr. Napoli through their mutual friend, Benjamin Crump.  Mr. Crump approached Ms. Palmore to work on the matter collaboratively and recommended both to Mr. Napoli and to Ms. Palmore that they should consider working together.

30.      Ms. Palmore had proven herself as a successful litigator capable of attracting and getting retained by notable clients for newsworthy cases.  Mr. Napoli suggested that Ms. Palmore would be excellent in the area of Mass Torts.

31.      At this meeting, Mr. Napoli marveled that he "had never met an African American female trial attorney before" and that Ms. Palmore "look[s] amazing for her age."

32.      Over the course of the next few weeks, late August through early September 2021, Ms. Palmore and Mr. Napoli had discussions regarding salary, title and role.

33.      Primarily, the Firm was to market Ms. Palmore as a prominent African American attorney to communities where that would resonate.

34.      However, the day-to-day litigation on the cases Ms. Palmore helped generate would be primarily handled by other attorneys.

35.      In addition to marketing Ms. Palmore to generate work, they also agreed that Ms. Palmore would occasionally try cases as needed given her vast trial experience.

---

[3]      See *e.g.* Costello, Alex, "Family of Jo-Jo Wright Files $150M Lawsuit Against Hempstead Town", *MSN,* (Nov. 17, 2021), available at: <u>https://www.msn.com/en-us/news/crime/family-of-jo-jo-wright-files-150m-lawsuit-against-hempstead-town/ar-AAQPpe1</u>.

36.     Ms. Palmore accepted the arrangement and was excited to continue advancing her career with the support of the Firm behind her.

**III.    Ms. Palmore Joins the Firm**

37.     In the weeks leading to her start date, Ms. Palmore had already lined up clients that started to contact her based on the publicity surrounding the McLeggan matter.  These clients retained the Firm shortly upon her arrival.

38.     Also during this time, Ms. Palmore was contacted by Waverly Lucas, a man with physical disabilities who was stopped by Suffolk County Police while walking into a gas station in August 2021.  Despite the fact that he had committed no crime and provided his identification properly, the officers used force on and ripped off Mr. Lucas's prosthetic leg to force him into the police vehicle.  Mr. Lucas retained Ms. Palmore and the Firm and the case garnered significant media attention.[4]

39.     Ms. Palmore officially started at the Firm on October 11, 2021.

40.     However, Ms. Palmore and the Firm were still working out the terms of her employment.

41.     An employment agreement was entered into in December 2021.

42.     Early on, Ms. Palmore observed the lack of diversity at the Firm generally as something that had to be addressed.

---

[4]     See e.g. Lee, Brian, "Federal Lawsuit Alleges Suffolk County Officers Ripped Man's Prosthetic Leg from His Body," ALM/*Law.com* (Aug. 11, 2022), available at: https://www.law.com/newyorklawjournal/2022/08/11/federal-lawsuit-alleges-suffolk-county-officers-ripped-mans-prosthetic-leg-from-his-body/?slreturn=20221002181337.

43.     As of Ms. Palmore's hiring, there were no Black Partners and only one Black attorney, who was an associate at the time.[5]

**IV.     The Firm Refuses to Properly Support and Market Ms. Palmore**

44.     Given the volume of cases she generated for the Firm, Ms. Palmore requested permission from Mr. Napoli to hire a paralegal to assist in getting the newly retained matters prepared for litigation.

45.     Ms. Palmore suggested hiring her former paralegal, among other reasons because he had developed excellent relationships within the African American community and was a strong believer of inclusivity.

46.     Mr. Napoli responded to Ms. Palmore's suggestion with, "but he's not Black."

47.     Weeks would pass before Ms. Palmore would receive a meaningful response from Mr. Napoli regarding the hiring request.  Ultimately, when Mr. Napoli denied Ms. Palmore's request to hire her former paralegal, he reasoned that would "mess up our salary cap."

48.     Mr. Napoli denying her request to hire a paralegal was concerning to Ms. Palmore as she was started to build her practice and needed support to do so.

49.     In her first month at the Firm, there were at least four matters Ms. Palmore brought in where no one at the Firm did an intake or even followed up.  This put Ms. Palmore in the position to have to field complaints from potential clients she brought to the Firm about the Firm's inability to handle their matter.

50.     The Firm's failure to take any meaningful action in the matters Ms. Palmore brought in had the potential to adversely impact her reputation within her network and various

---

[5]     Only two weeks after Ms. Palmore made complaints of discrimination within the Firm (described below), Mr. Felix was promoted to Partner.

communities, something she relied upon to generate referrals and business.  It also had the

potential to impact her financially as her compensation was tied to revenue generation.

51.     Also around this time, Ms. Palmore requested to schedule a meeting with Mr.

Napoli and Maria Hayashi (Director of Marketing) to discuss the Firm's marketing efforts which

had been a major selling point for her to join.  Mr. Napoli assured Ms. Palmore that they would

set something up "soon."  But Ms. Palmore had to repeatedly follow up as no proactive efforts

were taken by the Firm to advance the marketing strategy.

52.     After weeks, and several postponements, Ms. Palmore was finally able to get a

meeting to discuss marketing.  During this meeting, Mr. Napoli directed Ms. Hayashi to look

into advertising Ms. Palmore in posters on and around the Long Island Railroad ("LIRR").  In

response, Ms. Hayashi sent Ms. Palmore information regarding the different types of

advertisements and pricing, but nothing further was done.  When Ms. Palmore asked for follow-

up meetings regarding marketing, she was ignored.

53.     On November 5, 2021, Ms. Palmore was assigned her first trial matter, a "shitty

case" according to Joseph Ciaccio (Partner/Head of the Medical Malpractice Department.

54.     When Ms. Palmore first met with the client, the client was unhappy about the lack

of communication by the Firm and the fact that her case had taken 10 years to prosecute to trial.

55.     Ms. Palmore worked with her client and took a more responsive and

communicative approach in order to repair the relationship.

56.     Ms. Palmore also noticed that no one from the Firm had investigated or done

proper due diligence on the defendant doctor who she learned had engaged in documented prior

medical misconduct and was suspended.

57.     Ms. Palmore tried the case, which unfortunately resulted in a defense verdict (as was expected by those familiar with the matter).  Even so, Ms. Palmore was commended for her work by various members of the Firm, including Marie Napoli who wrote, "Next case. It was tough, but you will get them next time!"

58.     Following the trial, Ms. Palmore renewed her request for a concerted effort around marketing that she had been assured upon hire.  But Ms. Palmore's struggle to get meaningful or timely responses continued as her requests were either ignored or met with evasive responses such as "try for tomorrow please."

59.     Finally, on December 7, 2021, Ms. Palmore met with Ms. Hayashi, but all Ms. Hayashi was able to say about the marketing plan was, "I'm working on it with Paul."

60.     Ms. Palmore was repeatedly rebuffed, both in her efforts to get the Firm to market her and her attempts to bring business to the Firm *via* her network and experience.

61.     In January 2022, Ms. Palmore presented to Mr. Napoli an opportunity for corporate sponsorship of Alpha Kappa Alpha ("AKA"), the intercollegiate African American sorority.  Ms. Palmore is an AKA sister, which is home to many influential African American women, including but not limited to, Vice President Kamala Harris, Maya Angelou, Toni Morrison, Alicia Keys and Wanda Sykes.

62.     Ms. Palmore saw this sponsorship as an opportunity to both support an important organization and also to market the Firm, since many of Ms. Palmore's referrals came through connections in her network within the broad African American community.  By supporting AKA, the Firm could potentially reach hundreds of thousands of people.  The Firm declined to sponsor.

63.     By mid-January 2022, Ms. Palmore had requested yet another meeting with Ms. Hayashi and expressed her now growing concern that the Firm had done nothing to promote or market her.  Ms. Hayashi dismissed Ms. Palmore's concerns with, "I'll discuss with Paul and get back."  But Ms. Hayashi did not get back to her.

64.     In early February 2022, Ms. Palmore sent an email to Ms. Napoli, Mr. Napoli and Ms. Hayashi in her endless pursuit to obtain the Firm's marketing support.  In her email, Ms. Palmore suggested launching marketing efforts in New York City and Long Island and to target communities of color who are underrepresented.  Ms. Palmore emphasized that the Firm should use its diversity—although the reality is that there is very little beyond Ms. Palmore—as an asset.  Marie Napoli responded "Yes, we will set up a call and talk it through."  But no meeting was ever initiated.

65.     On February 10, 2022, Ms. Palmore wrote to Mr. Napoli, Hunter Shkolnik, Ms. Napoli, Craig Phemister (Associate) and Ms. Hayashi about connecting a correspondent on Law & Crime Network, MSBNC and Court TV.

66.     Ms. Palmore wanted to make this connection because the correspondent offered to help highlight the Firm's cases on national media platforms.

67.      Despite this offer of media attention from Ms. Palmore's personal network, Ms. Napoli responded to Ms. Palmore that "someone would circle back."  No one circled back.

68.     On March 31, 2022, Ms. Palmore traveled to Puerto Rico for a Partners' retreat with the Firm.  When she arrived at the Firm's Puerto Rico office, Ms. Palmore approached Ms. Hayashi and asked if she had time to go over media pitches.

69.     In response, Ms. Hayashi snapped at Ms. Palmore stating, "I don't have time for you, we will talk another day!"  Ms. Palmore was shaken by this reaction.  She had to go into another office to collect herself and process the interaction and how she was treated.

70.     On April 2, 2022, Ms. Palmore emailed Mr. Napoli regarding her large following in the U.S. Army on LinkedIn and proposed that the Firm should market her for potential clients in a mass tort case concerning defective earplugs supplied to members of the Armed Forces.

71.     Ms. Palmore thought her network would prove especially helpful to the Firm since her son is an officer in the Army and that Fort Benning, where he is stationed, is also a large retirement community, which could also be a source of potential clients.  Mr. Napoli responded, "Omg I never thought of it, lets talk in the morning."

72.     No immediate progress was made, and after several inquiries and delays, Ms. Hayashi finally created a flyer prefaced on Ms. Palmore's idea but that excluded her entirely. But instead of marketing Ms. Palmore, the Firm featured Hank Naughton, a white male Partner. Ms. Palmore was merely copied on the correspondences and was never asked for any input.

73.     In May 2022, Ms. Palmore suggested another idea to generate business to Mr. Napoli and Ms. Napoli.  This time, Ms. Palmore suggested the Firm look into starting a class action regarding the link between hair straightening products and an increased risk of cancer.

74.     During this conversation, Ms. Palmore explained that this would disproportionately impact Black women due to higher prevalence of use and societal pressure to straighten their hair rather than wear it naturally.  She highlighted that this would be an opportunity for the Firm to gain business and market within the African American community.

75.     Neither Mr. Napoli nor Ms. Napoli were enthused by the idea, but they offered to connect Ms. Palmore with someone in the Firm in Mass Torts/Class Actions area.  However,

they never did.  Ms. Palmore felt that they had not truly listened to her and had not tried to understand the pervasiveness of the issue in African American communities.

76.     On April 15, 2022, in an email to Mr. Ciaccio, Mr. Napoli, and Ms. Hayashi, Ms. Palmore continued to suggest marketing ideas to communities of color.  In response, Ms. Hayashi produced a document referencing COVID-19 fatalities in nursing homes and the disproportionate impact on minority communities.  However, the image on the document was clearly of white people rather than people of color.

77.     Ms. Palmore was unable to comprehend why there were no depictions of people of color in an advertisement intended for communities of color.  Ms. Palmore expressed her concern and in response Ms. Hayashi sent another draft featuring people of a darker complexion, but not clearly African American and the ad did not speak to the African American community in the way it could have if it was given proper attention.  In the end, no marketing ever took place.

78.     Also in mid-April, Ms. Palmore noticed that opposing counsel on a case being handled at the Firm was a former boss.   Proactively, Ms. Palmore wrote to Ms. Napoli and others staffed on the case, offering to use her connection to assist in settlement negotiations. Marie Napoli replied, "leave the negotiations to [us]."

79.     While Ms. Napoli is certainly entitled to handle her matters as she sees fit, Ms. Palmore felt Ms. Napoli's curt response was inconsiderate and inappropriate given Ms. Palmore's decades of experience.

80.     By the end of April 2022, Mr. Napoli sent Ms. Palmore a list of cases for her to handle since Mr. Phemister had left the Firm the month prior.  Mr. Napoli dubbed Mr.

Phemister's resignation a "shit show" due to the volume of litigation work he left behind and the condition the cases were in.

81.     Ms. Palmore had offered to assist on these matters until they hired additional litigation staff but felt that if an unreasonable amount of work was thrusted upon her it would and detract from her marketing and trial role.  Mr. Napoli completely disregarded Ms. Palmore's concerns and responded, "You can do all three!  I got to go."

82.     Despite her lack of support at the Firm and the condescension she was dealing with in response to her efforts, Ms. Palmore continued to proactively search for and pitch innovative ideas to advance the Firm through her own extensive network.

**V.     Ms. Palmore Observes Exclusionary Conduct and Discrimination**

83.     In addition to the disparate treatment in marketing and support set forth above, Ms. Palmore has observed exclusionary and discriminatory treatment at the Firm.  This conduct has taken various forms and together create a hostile and discriminatory work environment.

84.     On December 5, 2021, just two months after Ms. Palmore started at the Firm, a shocking act took place.  On this date, a stuffed bear was hung from a noose on a light fixture over a common area that is in direct view of Ms. Palmore's office and only her office.

85.     Ms. Palmore rushed out to take photographs and went to the office suites across the hall to members of the accounting department.  Ms. Palmore asked three members of the accounting department to see if they had any idea why it was there.

86.     Ms. Palmore then reported it to Human Resources ("HR") and a member of HR. HR offered no meaningful response to the bear hanging by its neck and instead, the HR personnel simply exclaimed, "oh, oh!"

87.     Shortly after excusing herself, Ms. Palmore returned to the common area and

noticed that the HR personnel and the bear that was previously hanging were both gone.

88.     Nobody from the Firm followed up with Ms. Palmore about this incident and there was no investigation.  A bear hanging from a noose outside the office of an African American attorney was of little concern to the Firm.

89.     Shortly thereafter, in mid-February 2021, Ms. Palmore travelled to San Juan, Puerto Rico for a business conference not associated with the Firm.  At the same time, Mr. Napoli, Ms. Napoli, and Mr. Shkolnik and his wife, were nearby in Dorado, Puerto Rico at an event the Firm was sponsoring for Fordham University.  Ms. Palmore travelled to Dorado and the five of them went out to dinner after the Firm sponsored event.

90.      During this dinner, Mr. Napoli introduced Ms. Palmore to his colleagues and friends as the "Black female Ben Crump" to which she responded, "No, my name is Heather Palmore."

91.     Ms. Palmore did not enjoy being reduced to her race and gender and explained that despite her and Mr. Crump both being attorneys, their experience greatly varied, and she did not like being referred to as the "female anything."

92.     Mr. Napoli did not respond to Ms. Palmore, let alone apologize for the characterization, and her feelings were neither addressed nor validated.

93.     On March 28, 2022, Gloria Werle (Head of HR) sent out information regarding the Firm's summer interns.  In response, Ms. Palmore submitted two names: an African American woman who attends Syracuse Law School, and an African American law school candidate from Emory University.

94.     The Firm hired the Syracuse Law School intern, but Ms. Palmore was disheartened to learn that she was not being paid as an intern.  The intern relayed to Ms. Palmore

that she was receiving only school credit for her internship and being paid was never even

offered.  Similarly, the Emory University student had turned down the opportunity to intern at

the Firm once she learned the position would be unpaid.[6]

95.     In early May 2022, Ms. Palmore attended a Mass Torts Conference in Puerto Rico

which was attended by other members of the Firm.  Ms. Palmore attended the welcome reception

and upon entry saw Joseph Napoli (Partner) who stated to her, "Who do you think you are,

walking around here like you are an Executive at the Firm."  Ms. Palmore had simply entered the

room and was immediately subjected to animus.  Ms. Palmore did not respond to Mr. Napoli—

she smiled and continued on to speak to other attorneys and vendors in attendance.

96.     At that same reception, Ms. Palmore noticed that Mr. Napoli, his wife and another

Partner had come to the reception, but despite there being room at Ms. Palmore's table, they sat

at another table.

97.     Ms. Palmore proceeded to follow members of the Firm to the table they were

going to when Joseph Napoli approached her before she could even reach the table and said,

"Get away…go over there."

98.     Ms. Palmore was left feeling totally humiliated and eventually found room at a

table with other female staff members from the Firm.  For the rest of the conference, Ms.

Palmore attended the CLE seminars but did not attend social events as she was too hurt,

undermined and unwilling to risk further public humiliation.

---

[6]     While details of the Firm's practices with respect to paying interns remains unclear, if
there is a practice of only providing school credit and not compensation, that would surely have a
racially discriminatory impact as it would be difficult for those from low-income communities to
intern at the Firm.

99.     In June 2022, Mr. Napoli requested that Ms. Palmore, Mr. Phemister and Sal Badala (Partner, General Counsel) appear in Federal Court for an appearance on a civil rights case involving a minority plaintiff.  Ms. Palmore has substantial experience in this area.  Despite this, before entering the courtroom, Mr. Napoli told Ms. Palmore, the only woman and person of color in the group, to just "be quiet and don't say anything."

100.    It appeared obvious to Ms. Palmore that Mr. Napoli wanted her to be there just so there would be a Black woman at counsel's table.

101.    In July 2022, Ms. Palmore was requested by Mr. Shkolnik to shoot two commercials for the Firm regarding adult sexual abuse and the recently passed Adult Survivors Act.  Ms. Palmore shot the commercials for two full days because Mr. Shkolnik requested a change to the script after Ms. Palmore had already spent a full day filming.  Despite this, Ms. Palmore made herself available to reshoot the commercial expeditiously.

102.    The Firm never aired either of the commercials shot by Ms. Palmore.  Instead of using the commercials with Ms. Palmore, the Firm decided to shoot and air the same commercial with two paid Caucasian actors.

103.    It is evident that the Firm had no intention of marketing an accomplished, African American female attorney as its face to the public.

**VI.**     **Ms. Palmore Complains About Discrimination at the Firm; Retaliation Follows**

104.    By this point, Ms. Palmore firmly believed that the Firm was exclusionary, lacked concern for issues of diversity and was unsupportive towards people of color.  She felt that she was brought to the Firm to help create an appearance of diversity, even if it was not an issue of genuine importance to the senior Partners.  Ms. Palmore also felt the Firm "used her" as a "token" African American when they felt it was in the Firm's interest.

105.     In June 2022, Ms. Palmore suggested to Mr. Napoli that the Firm should add a Chief Diversity Officer, and that she would be willing to take on that title.

106.     During this meeting, Mr. Napoli asserted that the title of Chief Diversity Officer "would not help generate business" like her present title of Chief Trial Counsel.  Mr. Napoli was completely unreceptive to the idea.

107.     On August 17, 2022, a document titled 'Personal Injury Reference Guide' ("Reference Guide") was circulated to the entire Personal Injury Department by Ashley Bohs (Paralegal).  In this guide, an Organizational Chart was prepared which included all the relevant staff and their appropriate titles.

108.     Notably, three people—Ms. Palmore, and two associates—were not included on the Organizational Chart.  Chun Ho Chung (Partner) was also incorrectly listed under the "Translation Team."  Overwhelmingly, those excluded or incorrectly identified are minorities. Representative examples (from the August 17, 2022 circulation) are shown here:





109.    The same day the Reference Guide was circulated, Ms. Palmore reached out to Ms. Bohs to inquire whether there was a reason why she, and others' names and titles were absent and why Mr. Chung was misidentified in the Organizational Chart.

110.    Separately from the email to Ms. Bohs, Ms. Palmore also emailed Mr. Napoli and Ms. Napoli to inquire the same.

111.    No one responded to Ms. Palmore's inquiries.

112.    During this time, Ms. Palmore was receiving inquiries from colleagues asking why she was not included in the Organizational Chart.

113.    The next day, August 18, 2022, another minority lawyer (Personal Injury Department Head) wrote to Ms. Bohs, Ms. Werle, Mr. Napoli and Mr. Chung, pointing out that Ms. Palmore's position of Chief Trial Counsel was not included on the Organizational Chart along with others.

114.    Ms. Bohs, who ignored Ms. Palmore's email, responded to this attorney that Ms. Palmore was not on the Organizational Chart because she does not carry a case load nor have a case management team assigned to her.

115.    Ms. Palmore, who was cc'ed on this attorney's email, responded that she was never supposed to have a case load, but that given Mr. Phemister's departure, which was already four months ago, she had taken on a case load, not to mention that she tries cases.  Ms. Palmore made these points and very clearly stated that "This does not reflect inclusion [] and the necessary changes should be made."  No response from anyone followed.

116.    On August 23, 2022, Ms. Werle sent the Partners distribution email list, of which Ms. Palmore was a member since her hire, a draft of an Employee Survey that was generated by HR and asked for input.

117.    Ms. Palmore offered Ms. Werle thoughtful suggestions.  By way of example, in the original draft of the Survey Question 13 stated, "Do you feel the Firm fosters inclusion and protects employees from discrimination and harassment?"  Ms. Palmore suggested that Question 13 was confusingly compound and suggested it broken into the following separate questions, (a) "Does the Firm foster and promote diversity, equity and inclusion," and (b) "Does the firm protect its employees from discrimination and retaliation?"

118.    Ms. Palmore's suggestion was rejected and Ms. Werle left Question 13 as it was in the draft.

119.    One week later, the Employee Survey was circulated throughout the Firm.

120.    On September 13, 2022, Ms. Werle circulated another email to the Firm thanking members for their participation and acknowledging that "[s]ome questions reflected very high satisfaction rate [among employees], and some did not."

121.    In that same email, Ms. Werle requested a representative from each department to join a Task Force to discuss the results more closely and implement some actions.

122.    Steadfast in her pursuit for diversity, equity and inclusion (DEI), Ms. Palmore

requested to participate in the Task Force, stating:

> I would like to represent all departments, especially at it pertains to
> the issue of diversity, equity, inclusion, and discrimination/
> harassment. I served as the Diversity and Inclusion Chair for CNA
> Insurance, which was a national position that I was appointed by the
> CEO of CNA and served two terms. I also previously served as
> Compliance Officer as a Partner.
>
> This is a very serious issue that needs to be addressed and my
> background and expertise in this area will be an asset to all of us
> here at Napoli Shkolnik as we move forward to improve the work
> culture.

123.    Ms. Werle responded to Ms. Palmore's request to join the Task Force with,

"Wonderful! FYI overall very satisfied with diversity/harassment categories."  In effect, Ms.

Werle was telling Ms. Palmore that while she could join, her efforts towards DEI were not

needed.

124.    None of the Firm's senior Partners volunteered to participate in the Task Force.

125.    Prior to the first Task Force meeting, September 22, 2022, Ms. Werle circulated

an invitation to members of the Task Force for the first meeting and included feedback from the

2022 Employee Survey therein.  Notably, an anonymous employee response to the Survey stated,

*inter alia:*

> Often clients are disrespectful, racist and unprofessional and we
> need as employees that the company and supervisors have a strong
> hand against that type of behavior. Also [it] is very important that
> all employees understand that making comments regard[ing] accent
> or pronunciation, should be penalized and not tolerated, not from
> our attorneys nor co-counsel. It should be considered to [es]tablish
> or make more public a more strict policy against the conduct of the
> co-counsel, attorneys/our attorneys, often they are disrespectful and
> tend to scream a lot to the Napoli employees, racist and
> inappropriate, aggressive and unprofessional conduct should not be
> tolerated, neither making comments regard[ing] our
> accents/pronunciation. It also should be available for us the

24

procedure to present to the administration any sexual harassment complaint[ts] of comments or conducts. The same goes to the racist conduct, how should we proceed when a coworker or a client has done a racist behavior/inappropriate behavior? This is a great law firm with amazing partners and coworkers, they are just some gray areas that need to be worked on.

126.    It is clear from the statement set forth above that the Firm engaged in and acquiesced racist conduct of its members, clients and co-counsel.  To make matters worse, the employee was unaware of any reporting mechanism at the Firm for instances of harassing and/or discriminatory conduct.  Essentially, employees were made to suffer harassing and/or discriminatory conduct in silence.

127.    That same day, an egregious example of the Firm's acquiescence to discriminatory conduct and lack of focus in DEI came to Ms. Palmore's attention.  An associate told Ms. Palmore that a client told her she did not want a woman as her attorney and wanted a man because "men are more aggressive" and will "get the job done."

128.    During this discussion, Ms. Palmore learned that instead of the Firm denouncing this discriminatory directive or standing behind the female associate and her competency as an attorney regardless of her gender, the Firm agreed to this discriminatory request and reassigned the case to a male attorney.

129.    The female associate explained to Ms. Palmore that Ms. Napoli minimized the matter as somehow "normal" and said, "it's just the business" and "half our clients are difficult." Thus, Ms. Napoli said that permitting discrimination is just a part of the business, so the female associate had to "deal with it."

130.    Later that day, Ms. Palmore attended the first Task Force meeting.  During the meeting, Ms. Palmore requested a breakdown of the Employee Survey which would show the number of respondents and satisfaction results for each question.

131.    Ms. Werle had circulated the 2018 breakdown to the Task Force and Ms. Palmore felt the same information should be provided for the 2022 survey so the results, trends and developments over time could be reviewed.

132.    Ms. Werle refused to circulate these results and instead said she would only provide the breakdown to Ms. Palmore.  Ms. Werle never provided the breakdown of the 2022 Employee Survey.

133.    Ms. Palmore also stated to the Task Force that DEI was an issue that the Firm had to take more seriously and that there must be a clear stance against discrimination.

134.    In response, Ms. Werle exclaimed that, "as a Latina woman who was put in charge of overseeing operations in Puerto Rico, I have never experienced discrimination, so I don't know what you mean by discrimination."

135.    Of course, Ms. Palmore had a different experience, and she knew that the female associate had just been a victim of discrimination days before.

136.    At this point, Ms. Palmore decided she had to raise a more formal complaint.

137.    On September 24, 2022, Ms. Palmore wrote to Mr. Napoli, Ms. Napoli, Mr. Shkolnik and Mr. Badala about the discriminatory conduct at the Firm.  In this email, Ms. Palmore stated, *inter alia*:

> As shared with Gloria Werle, the main purpose for which I wanted to be on this Task Force is based upon [m]y background and experience in Diversity, Equity and Inclusion and as a Compliance Officer . . . Nothing was more apparent for the need to address the issues of DEI, than at ou[r] Task Force meeting on Thursday, September 22, 2022, although it was not included on the agenda, which was alarming. That being said, there were a number of topics addressed.
>
> Prior to the meeting and at the meeting, I asked Gloria/HR Department if they can provide us (Task Force) with the data concerning the Employee Survey, not just a "summary" of what

people said. We were provided with the 2018 data, which included number of respondents and percentages/data relative to the responses to specific questions. A request was made for the same for 2022 prior to the meeting, and in the meeting, I was informed that it would be provided to me only, since I requested the same. This is information that should be provided to the entire Task Force. Representation from Gloria Werle to me in a private email that "FYI overall very satisfied results with diversity/harassment categories" was not only unsettling, but did not comport with the culture that cannot any longer be ignored at Napoli Shkolnik, especially when (1) the data was never made available to the Task Force (2) there are a number of instances where the firm has failed to address instances of discrimination adequately or at all and (3) statements were made to the entire task force from Gloria Werle that as a "Latina woman who was put in charge of overseeing operations in Puerto Rico, I have never experienced discrimination, so I don't know what you mean by discrimination." When this statement was openly made in front of the entire Task Force, I will inform you that ·almost everyone who was on that call found it not to be only inappropriate, but offensive . . .and that we could not believe that was articulated and outwardly stated by the Head of Human Resources. This is a problem. It was apparent and easy to deduce that diversity, inclusion, discrimination and equity are not a priority to someone who is tasked with the responsibility to make sure that we are all in a safe, non toxic, harassment free, diverse, equitable and inclusive environment.

Not everyone feels they can come to leadership with this concern for fear of reprisal and retaliation. I am not one of them and therefore I am speaking for a LARGE number of our attorneys and staff, particularly of color, and protected classes that this culture cannot continue. There are a NUMBER of people with issues relating to DEI and they have not spoken out for fear of reprisal.

[A female associate], who I shared an office with on Thursday, shared with me that a client told her that she did not want her as her attorney because she wanted a "man" and that "men are more aggressive" and will get the job done. She shared with me that she reported this to Marie Napoli, and her above report, to which she was told "half our clients are difficult" – and the case reassigned. We MUST protect our colleagues both internally and externally by taking a stand against discrimination, whether it is based upon gender, race, national origin, disability and any other protected class.

If we are going to represent clients in the areas of civil rights, discrimination, child abuse, sexual assault, harassment and other related areas, we MUST address these issues internally. Continuing failure to do so, promotes a culture of discrimination, complicity, and wanton disregard for the real issues we face in the workplace. This has also been articulated in the survey by statements shared by colleagues at NS.

During the meeting, Gloria stated that she and I will work together to address these issues. The expectation of all, is that we will see marked and identifiable change as a result of working collaboratively in this DEI space. What was clear from the meeting is that as an Latina woman who openly stated that she has never been discriminated against, is not something that sits well with many of us of color in the United States-and it is my hope that such sentiment was not repeated in the meeting that followed in Puerto Rico.

Again, I will state that communities of color have be a large client base for NS nationwide. We should have people of color in KEY leadership positions at NS, reflective of the communities that we serve as well-not disregarded, overlooked, marginalized, given menial tasks and treated differently from our colleagues because of race, gender, disability and any other protected class. We cannot hold ourselves out to handle and advocate for those who have had their civil rights, employment and environmental rights violated, if we are not doing right internally by our own people. Period.

Once the respect is established and openly stated and communicated from leadership, coupled with diversity and inclusion training, that is not simply "lip service" but a true investment in turning the culture around, many of the day to day issues pertaining to operations and delivering top rate client service, will, with time and genuine reflection, make NS a premier firm not only in delivering first rate service, but a place that people will feel comfortable, that their diverse voices are heard, and in turn, experience lower attrition. In the interim, and as shared before, we should have someone to lead this initiative, outside of the current Human Resources, but that can work collaboratively with HR to address these matters and protect NS from liability.

I was going to wait to send this correspondence, but this has been weighing heavily on me and many of the employees of color who have shared these and many other instances of marginalization, discrimination, inequality and lack of inclusion.

This correspondence is not meant to draw responses, back and forth, that will take away from the work we need to accomplish over the weekend. As I am preparing for an upcoming trial, I did not want to delay any further in sharing my position and that of many in our workplace. People should feel confident that ANY and ALL instances of discrimination, toxic work environment, etc, internally and externally are addressed and in compliance with the law.

I believe that you, the leaders of this firm, with all due respect, will take these concerns relating to diversity, equity, and inclusion seriously, and I look forward to addressing the same. Thank you.

138.    That same day, Ms. Palmore received a call from Mr. Napoli in response to her correspondence regarding her concerns about workplace discrimination.

139.    Mr. Napoli started the call by yelling "what are you doing? Now I have to call my [insurance] broker."  He continued to scream at her claiming that it is his Firm and he can run the it however he wants.  Mr. Napoli's voice was raised for the duration of this call, and he was demonstrably angry at Ms. Palmore for raising her concerns.  Mr. Napoli ended the call by blaming Ms. Palmore for "ruining [his] dinner plans."

140.    Later that evening, despite that he had already berated Ms. Palmore for her concerns earlier, Mr. Napoli responded to her email falsely stating that the Firm takes the issues she has "seriously" and assigns them a "major priority."  This was an obvious attempt to create a false record.

141.    That following Monday, Ms. Palmore received an email from Mr. Badala requesting that she provide more detailed information regarding each instance of discrimination she had observed at the Firm.

142.    Mr. Badala further instructed Ms. Palmore that an attorney at L'Abbate, Balkan, Colavita & Contini, LLP ("L'Abbate") would be doing an "independent investigation" and

would be in the office the following day to interview Ms. Palmore regarding her complaints of discrimination.

143.    Ms. Palmore was interviewed for four hours during which time she described much, though not all, of the details set forth herein.

144.    The investigation proved to be illegitimate from the start as fewer than five employees were interviewed regarding workplace culture at the Firm despite the fact that Ms. Palmore's complaints indicated numerous people would have relevant information.

145.     The result was no finding that the Firm engaged in any discriminatory conduct, even though it was indisputable that the Firm acceded to a client's discriminatory request with respect to a female associate.

146.    Three days later, Ms. Palmore received an email from Mr. Napoli stating nothing but "We need to talk" in the subject line.  Mr. Napoli called Ms. Palmore *via* Microsoft Teams and, again, began to scream at her claiming that Ms. Werle had said she was going to resign because of Ms. Palmore.

147.    During this call, Mr. Napoli blamed Ms. Palmore for the fact that he had nobody to do payroll without Ms. Werle.  Mr. Napoli continued to yell at Ms. Palmore saying that the Firm is a "family firm" which he can run how he wants and that he had to deal with Ms. Werle being upset and crying over Ms. Palmore's discrimination claims.

148.    Mr. Napoli continued to yell at Ms. Palmore that he had to spend "$50,000 for this investigation," referring to the retention of L'Abbate, and further stated that Ms. Palmore "did not care" that he had to spend $50,000 for the investigation.

149.    Ms. Palmore responded that she cared about the issues of DEI at the Firm and that they needed to be addressed.  By way of example, she stated that Ms. Napoli transferring a

female associate's case to a male attorney was completely improper, as evidenced by the fact Mr. Badala ultimately told the Firm to disengage that client.

150.    In response, Paul Napoli merely stated that he had to go to another meeting and completely disregarded overt discrimination at the Firm as an issue.

151.    Ms. Werle never actually resigned.

152.    The following Monday, October 3, 2022, without any acknowledgment regarding her "resignation" for which Ms. Palmore was berated and blamed, Ms. Werle circulated an announcement that the firm had hired Kenneth Chesebro.

153.    Ms. Palmore had been told by another employee that they had researched Mr. Chesebro and found that he heavily influenced the January 6, 2021 insurrection of the U.S. Capitol and had been involved in President Trump's attempt to overturn the 2020 election.[7]

154.    In fact, the House Select Committee report on the January 6 Insurrection ("the Report") found that Mr. Chesebro was the architect of the fake elector plot and that he drafted memos on November 18 and December 9 and 13, 2020, outlining a scheme by which slates of alternate electors in various swing states would fraudulently gather to cast electoral votes in favor of Trump.

155.    Mr. Chesebro's fake elector plot largely targeted ballots in cities with large Black populations in an attempt to overturn former-President Trump's defeat in the 2020 election.[8]

---

[7]    A New York Times article detailed that an ethics complaint had been filed for Mr. Chesebro's role.  See Savage, Charlie, "Lawyers Group Asks Court to Punish an Author of Trump Electors Scheme," New York Times (Oct. 12, 2022), available at: https://www.nytimes.com/2022/10/12/us/politics/kenneth-chesebro-trump-fake-electors.html.

[8]    Juana Summers, *Trump Push To Invalidate Votes In Heavily Black Cities Alarms Civil Rights Groups*, NPR WNYC (Nov. 24, 2020), available at: https://www.npr.org/2020/11/24/938187233/trump-push-to-invalidate-votes-in-heavily-black-cities-alarms-civil-rights-groups

156.    Ms. Palmore felt as though the hiring of Mr. Chesebro was the opposite of attempting to create an environment with heightened ethics and inclusivity.

157.    After complaining of discrimination at the Firm, Ms. Palmore was intentionally ignored in meetings and was made to essentially "beg" to try a case that had no attorney assigned to it.

158.    In seeking to be assigned to a matter, Ms. Palmore told Mr. Napoli that there was no basis to deny her request as there was no other attorney assigned.

159.    Mr. Napoli responded that he has a right to "think through who he wants to try cases," although Ms. Palmore is Chief Trial Counsel for the Firm.

160.    Ms. Palmore felt completely humiliated by having to expend such effort to be assigned a matter at the Firm given her title and exceptional litigation experience.

161.    On October 17, 2022, without any context, Ms. Palmore received a Microsoft Teams invitation from Mr. Napoli and Mr. Shkolnik for that Wednesday.

162.    Fearful of further retaliation for her complaints of discrimination, Ms. Palmore simply requested from Mr. Napoli and Mr. Shkolnik an agenda for the meeting since she had no idea what they wanted to discuss.  After several hours of no response and the meeting looming the next morning, Ms. Palmore followed up.

163.    Later that night, in a blatant display of the animus towards Ms. Palmore, Mr. Shkolnik called her reasonable requests "demands" and claimed that he has never in his career been asked to provide someone with information regarding a requested meeting.  The level of anger coming from Mr. Shkolnik towards Ms. Palmore was blatant.  However, he told her the meeting was for her yearly review.

164.     On October 19, 2022, Ms. Palmore attended the Teams meeting with Mr. Napoli and Mr. Shkolnik, and was told, for the first time ever, that there were supposed problems with her work.

165.     During this meeting, Mr. Napoli said that "we [the Firm] are not getting out of you what we expected to get out of you."

166.     Ms. Palmore responded that since her hire she had repeatedly requested that the Firm market her but the Firm failed to do so.  Ms. Palmore was then accused of wanting to argue, which she did not dignify with a response, and requested to know the point of the meeting.

167.     Mr. Napoli then told her the point—the Firm would be reducing her salary an unspecified amount because she was not meeting expectations.

168.     Also during this meeting, Ms. Palmore was admonished as "taking an aggressive tone" to which she questioned if they were only making that accusation because she is a woman. She was told that question was "inappropriate" and it went unanswered.

169.     Given the adverse employment action taken against her and her constant belittlement during the conversation, Ms. Palmore began to feel physically and mentally distressed and unwell and ended the meeting.

**VII.    The Firm Continues to Harass Ms. Palmore After She Retains Counsel**

170.     On October 19, 2022, Ms. Palmore through her counsel, sent the Firm a short representation letter ("Representation Letter") which stated Ms. Palmore was represented by counsel with respect to her claims of discrimination and retaliation and that a more detailed letter describing her claims in detail would be forthcoming.

171.    An attorney at L'Abbate shortly thereafter identified herself as the Firm's advocacy and defense counsel, even though L'Abbate's previous role was supposedly in an "independent" capacity investigating Ms. Palmore's complaints.

172.    The next day, October 20, 2022, Ms. Palmore lost remote access to the Firm's network in its entirety.  This issue continues to persist through present day.  She has been unable to access the Firm's database and any of her case files using remote access.

173.    Ms. Palmore has suffered from an upper respiratory infection for more than a week and was forced to work in-office throughout due to this restriction.  As such, she reached out to the IT representative who could not ascertain the issue and simply told her that they do not know why the total lack of remote access is happening.  Ms. Palmore never had this persistent of an issue until the day after the Representation Letter.

174.    On Saturday, October 22, 2022, in a clear effort to deter Ms. Palmore from engaging in protected activity, Mr. Napoli circulated an email to the entire Firm, the type of which the Firm had never before sent to its employees, stating,

> This is a reminder that Forwarding Firm Email or Information to Personal Emails is violation of the law firm policy and a potential ethics violation. It is not necessary, it is not secure, it creates liability issues, violates the firm confidentiality obligations and the confidentiality rules with the firm. Please advise if you have done this to Sal Badala by Monday at 5pm eastern so we can take appropriate steps to remedy the situation and secure the confidential information. Failure to inform us can result in adverse employment action. At Napoli Shkolnik we strive to protect client and firm information which is firm and client property.

175.    On October 25, 2022, Ms. Palmore received an email from Mr. Napoli requesting her availability on Friday, October 28, 2022, to finish her yearly review that ended early the week prior.

176.     In response, Ms. Palmore advised Mr. Napoli that her niece had recently passed away and she would be out of town with her family that date for the funeral.

177.     In yet another blatant show of animus towards Ms. Palmore, Mr. Napoli falsely accused her of avoiding him (she had been working and he had not sought to reschedule the meeting himself), and ended the email with, "it is not my job to chase you."

178.     In response, Ms. Palmore appropriately detailed to Mr. Napoli how the email he sent was yet another example of his hostility towards her.

179.     She explained that she was not avoiding him and stated that now more than ever—based on the pattern of retaliation and increasingly aggressive hostility—she felt unsafe with the prospect of meeting with Mr. Napoli again.  Ms. Palmore expressed that the harassment had taken a toll on her physical and mental health and demanded for it to cease immediately.

180.     Mr. Napoli penned a lengthy reply to Ms. Palmore, which was further permeated with vitriol.

181.     First, Mr. Napoli denounced that Ms. Palmore could possibly feel unsafe considering his geographical distance from her, as if his physical distance from her means that the distress he was causing her could not have a physical effect on her.  Mr. Napoli, as a personal injury lawyer, knows this very well.

182.     Second, Mr. Napoli wrote extensively his conclusion that Ms. Palmore's feelings were baseless.  He asserted the position that "Our firm has a long history of championing these causes that defy these allegations," in effect claiming that the Firm could not have discriminated against her simply because the Firm had made money representing minority clients.

183.    Third, Mr. Napoli made it clear that he was not open to listening any further to Ms. Palmore's claims.  He concluded, as he always had, that he and the Firm had done nothing wrong and would not be told otherwise by Ms. Palmore.

184.    Fourth, Mr. Napoli said, "when you raised your 'concerns, [the Firm] immediately hired an independent investigator, conducted interviews and promptly disposed of the allegations."  As Ms. Palmore already knew, the "independent investigator," Ms. Monahan was not a truly independent investigator.

185.    Moreover, Mr. Napoli's claimed that Ms. Palmore's complaint was "disposed of," as if it was tossed in the garbage.

186.    Fifth, Mr. Napoli then went on to write that since the Firm had not yet heard of any claims of discrimination that had not already been addressed, that "we will assume there are no other claims."  That is, despite that the Representation Letter expressly stating, "we will be providing you with a more comprehensive letter in short order, describing the unlawful conduct committed by the Firm and its employees in detail," and that letter had not yet been sent, Mr. Napoli had already made up his mind.

187.    For Mr. Napoli to "assume" that there were no further allegations when he was on written notice that detailed allegations were forthcoming only further shows his and the Firm's pre-ordained determination that no matter what Ms. Palmore ever had to say that it simply did not care.

188.    Finally, Mr. Napoli ended the email by stating that he hoped Ms. Palmore has a change of heart and stops with the "spurious claims."

189.    For all the reasons set forth above, it is clear the Firm has no interest whatsoever in creating an environment where Ms. Palmore can safely continue to work let alone succeed.

**VIII.   The Firm Further Retaliates Against Ms. Palmore and Continues to Foster a <u>Discriminatory Culture</u>**

190.     On Monday, October 31, 2022, Ms. Palmore noticed a change to the caption above her photo on the Firm website that had not been there the week prior.

191.     The Firm changed Ms. Palmore's caption from "Chief Trial Counsel" to "Of Counsel/Chief Trial Counsel," making it clear to the public that she is not a Partner.

192.     The change to Ms. Palmore's caption comes after over a year of working at the Firm, but only 11 days after the Firm received the Representation Letter.

193.     On Wednesday, November 2, 2022, there was a previously scheduled Partners' meeting on Ms. Palmore's calendar.  She has attended Partners' meetings and been a part of the Partners' distribution e-mail list since she was hired.

194.     However, on this date, Ms. Palmore realized she did not receive a link for the previously scheduled meeting as she always had.  Ms. Palmore used a previous link to log on to the meeting and was surprised to find she was the only member logged onto the meeting.

195.     Ms. Palmore then emailed all of the Partners inquiring about the meeting.  Mr. Shkolnik responded and said that the meeting had been moved to the next day.

196.     The next day, Ms. Palmore logged onto the Partners' meeting only to be told that the meeting would be adjourned and that everyone would be apprised of the rescheduled date. Ms. Palmore never received notification of the rescheduled date and has not since received any email communication from the Partners' distribution list.

197.     On Friday, November 4, 2022, the Firm received a more detailed letter describing Ms. Palmore's claims ("Claim Letter") at approximately 2:13 p.m.  The Claim Letter was a 20-page, single spaced correspondence detailing Ms. Palmore's claims as set forth above.

198.     Within the hour, Ms. Palmore was unable to log on to the Firm's network from any of her devices, her computer at the Melville office included.  Upon attempting to sign in at this time, Ms. Palmore received notification that her credentials were invalid.

199.     Ms. Palmore once again had to contact IT, who also could not log in to the Firm's network with her credentials.  IT had to change Ms. Palmore's password and spend significant time attempting to gain reentry to the network.

200.     On Monday, November 7, 2022, Ms. Palmore, once again had to spend multiple hours working with IT as her credentials were not accepted by the Firm's network.  Ms. Palmore had to reset another new password.  IT claims that they do not know why her credentials have become a regular issue when trying to access the Firm's network.

201.     Also on November 7, 2022, Ms. Palmore attempted to login to the Personal Injury ("PI") Department's regularly scheduled daily meeting, as she always had, at 4:00 p.m.  Again, Ms. Palmore found herself to be the only participant logged onto the meeting.

202.     Ms. Palmore reached out to another PI employee inquiring about the meeting.  It was at this point that Ms. Palmore learned the meeting had been rescheduled to 3:30 p.m. earlier that day.  Perplexed, Ms. Palmore stated that she did not receive the email that rescheduled the meeting to which her fellow employee responded, confirming that Ms. Palmore was no longer on the PI distribution list.

203.     Mr. Napoli has, in writing, accused Ms. Palmore of "not doing any work for the office," yet the Firm has inhibited her on an almost daily basis from adequately performing her job since she retained counsel.

204.     On Tuesday, November 8, 2022, Ms. Palmore was unable to gain access to the Firm's Paycom system—its centralized online system for Human Resources.  Ms. Palmore was

unable to access any employment related polices, benefits information, or pay stubs. Her credentials were rejected when she sought access. Ms. Palmore had to expend time to contact IT and wait while they remedied the issue.

205.    On Wednesday, November 9, 2022, Ms. Palmore's credentials were again rejected by the Firm's network. Ms. Palmore had to again contact IT and have her password reset. IT reiterated that they do not know what is going on. Meaningful time has been taken away from Ms. Palmore's workday by her daily need to expend time contacting IT and resetting passwords just to be able to perform basic job functions like clocking in and accessing her case files.

206.    Also on November 9, 2022, Mr. Napoli and Ms. Napoli arrived at the Melville office, where Ms. Palmore has been forced to work in-person daily. They had not visited the Melville office in at least four months. Mr. Napoli and Ms. Napoli did not apprise anyone of their visit (like they had previously always done when working out of Melville) and arrived with two gentlemen unknown to employees at the Melville office.

207.    Ms. Palmore confined herself to her office so as to not run into Mr. Napoli who has engaged in harassing conduct as outlined above. Mr. Napoli is fully aware that Ms. Palmore feels unsafe in his presence and used his "distant" geographical location as basis to invalidate her feelings. Yet, Mr. Napoli arrived at the Melville office, where he knows Ms. Palmore works, unannounced.

208.    Later that same day, on a whiteboard by the communal kitchen area at the Melville office, Ms. Palmore noticed the following "riddle" written: "what is something that no one wants, but no one wants to lose."

209.    This invited other written responses such as, "duel to the death" and "work."  It appeared the same person who posed the initial question prompted, "looking for another answer related to where we work."

210.    Someone wrote, "lawsuit" which was underlined and had a check mark affixed next to it, seemingly indicating that it is the correct answer.

211.    Less than one week after the Firm received Ms. Palmore's Claim Letter and on the same day Mr. Napoli and Ms. Napoli arrive at the Melville office, the sentiment that no one wants to lose a lawsuit was posted for everyone at the Melville office to see.

212.    Due to the clearly retaliatory conduct set forth above, Ms. Palmore, through her counsel, sent the Firm a cease-and-desist letter ("Cease & Desist Letter") containing a list of the Firm's unacceptable behavior.  The Cease & Desist Letter further called for the retaliatory conduct to be remedied immediately.

213.    The Firm did not respond to Ms. Palmore's Cease & Desist Letter, neither denying engaging in retaliatory conduct against her nor agreeing to remedy the conduct.

214.    Even after receiving a Cease & Desist Letter from Ms. Palmore requesting that the Firm stop in its onslaught of retaliatory conduct, the Firm continued to retaliate against her.

215.    On November 17, 2022, Ms. Palmore learned that the Melville office, where she works in-person daily, held a social event at Fogo De Chao, a restaurant up the street.  Ms. Palmore had to learn about the event from another employee that noticed her absence.

216.    As it turns out, the Firm's HR personnel Roxann Rowe circulated an invitation to the 'Napoli Shkolnik Melville Social at Fogo De Chao' on Monday, November 14, 2022.

217.    Not only did Ms. Palmore learn that she was not invited to the Firm social event, but she also learned she had been removed from the Long Island office email distribution list to which the invitation was circulated.

218.    On Wednesday, November 30, 2022, Ms. Palmore, once again, sought assistance from the Firm's HR department regarding her lack of remote access to the Firm's network.

219.    Ms. Palmore received no meaningful response as to why she, in particular, has had no remote access for over six weeks.

220.    In response to Ms. Palmore's inquiry, Ms. Rowe chuckled as she told Ms. Palmore she does not know why Ms. Palmore does not have remote access and claimed the Firm tried to fix it.

221.    Also on November 30, 2022, we have come to learn that during the Firm's daily Personal Injury ("PI") department meeting, members of the Firm were discussing an African American male client who styles his hair in dreadlocks.

222.    In the course of this discussion, an attorney at the Firm stated that the client should cut his hair "to look neat."

223.    Another member of the Firm inquired whether "they [the client's dreadlocks] were stinky."  Multiple members of the Firm felt comfortable to engage in overtly racist rhetoric in front of the entire PI department, which included racial minorities.

224.    On Monday, December 5, 2022, Ms. Palmore learned that the Firm was hosting a holiday party for its members at Blackstone Steakhouse in Melville, New York on December 20, 2022 for which she did not receive an invitation.

225.    Also on December 5, 2022, Ms. Palmore learned that the invitation for the holiday party had been circulated well in advance by Ms. Hayashi on November 28, 2022.

226. Ms. Hayashi circulated the invitation to the Long Island office distribution list, among others, and copied members of the Firm individually. Notably, Ms. Palmore was not individually included despite being an active member at the Firm and remains removed from the Long Island office distribution list.

227. Clearly, the Firm desires to humiliate and retaliate against Ms. Palmore for her engagement in protected activities while she is an active employee.

## IX. The Parties Engage in Pre-Litigation Settlement Negotiations and the Firm Continues its Onslaught of Harassment and Retaliation

228. Given the ongoing conduct since the Representation Letter, Ms. Palmore's counsel informed the Firm that she would be initiating litigation.

229. On the precipice of litigation, the Firm begged Ms. Palmore to refrain from filing this Complaint in order to engage in settlement discussions *via* mediation.

230. Upon information and belief, the Firm only agreed to mediation as part of a retaliatory plan to prevent her from filing her lawsuit, interfere with her ability to access the courts and vindicate her rights.

231. On January 12, 2023, Ms. Palmore and the Firm engaged in its first mediation session. The Firm offered Ms. Palmore hundreds of thousands of dollars to resolve her claims and not file this action but the parties did not reach a resolution.

232. At the end of the mediation, the Firm begged Ms. Palmore to hold off filing this litigation so that the parties could schedule a second mediation and the parties agreed that Ms. Palmore would work remotely thereafter until the continued mediation date.

233. Upon information and belief, this was deceptive conduct perpetrated on the mediator, Ms. Palmore and her counsel, all intended to buy the Firm with more time to prepare a preemptive lawsuit against Ms. Palmore.

234.     A second mediation session was scheduled for February 27, 2023.

235.     While Ms. Palmore refrained from filing this Complaint as she promised, the Firm continued its unrelenting harassment and retaliation, detailed further below.

236.     On February 7, 2023, Ms. Palmore submitted a report with her hours worked the day prior.  Part of Ms. Palmore's report indicated that she had met with a potential client in order to assess whether it would be a good case for the Firm, as is part of her job.  Ms. Palmore has submitted many similar reports indicating that she had met with a potential client.

237.     On February 13, 2023, Paul Napoli challenged the integrity of Ms. Palmore's Daily Report by insinuating that she had not actually done the reported work.  First, Mr. Napoli asked Ms. Palmore to send him the "notes of each of these meetings," an extremely demeaning and condescending request of a senior lawyer at the Firm, clearly intended to demonstrate that she somehow is not doing the work she reported.

238.     Before Ms. Palmore could even respond, he followed up and emailed her again, this time with an array of questions similarly demeaning and condescending, including but not limited, to, asking if she ran a conflicts check, asking if she ran the facts by the partners, and referring to "potential intakes" (in quotes in original) as if to suggest that these intake meetings did not occur.

239.     Further, Mr. Napoli's email completely unreasonably asked Ms. Palmore to do a full write up for each prospective client, including an array of information, within the next three days.  All of this is entirely contrary to how the Firm operates with other senior lawyers and how Ms. Palmore has worked at the Firm before she retained counsel and asserted discrimination complaints.

240.    Also on February 13, 2023, *via* email to HR personnel Ms. Rowe, Ms. Palmore alerted the Firm that she is currently suffering serious, unforeseen medical conditions that would necessitate a variety of medical appointments that week.  Accordingly, Ms. Palmore informed Ms. Rowe that, at the least, Ms. Palmore would need to take medical leave from work for the rest of the week through Friday, February 17, 2023.

241.    Again, Mr. Napoli interjected himself and personally emailed Ms. Palmore to harass and retaliate against her, despite learning that she is battling serious health conditions.

242.    Mr. Napoli rather than show even a modicum of sympathy or support, wrote, "it is the policy <u>and</u> practice of the firm to require supporting medical documentation when someone calls out multiple days in a row because of a medical condition. We require that you provide supporting medical documentation."[9]  Ms. Palmore has never had to submit supporting medical documentation in order to take time off from work to tend to her health.

243.    Devoid of any compassion, Mr. Napoli continued on to accuse Ms. Palmore of taking a "large number" of days off.  In fact, the opposite is true.  Ms. Palmore has hardly taken any time off work for vacations, personal time, medical conditions or illness.

244.    Additionally, as detailed above, Ms. Palmore worked in-person daily through an upper respiratory infection for over a week when she lost remote access to the Firm's network the day after the Firm received a representation letter from Ms. Palmore's counsel.  This is obviously a further attempt to harass Ms. Palmore, and this time while she suffers serious health conditions no less.

---

[9]    Mr. Napoli's ending remarks, "Notwithstanding, we wish you the best," is nothing other than a lack of sincerity and a slap in the face.

245.    Further, Mr. Napoli found this to be the occasion to remind Ms. Palmore of the information on potential clients (described above) he arbitrarily assigned her just a few hours earlier *that same day*.

246.    Mr. Napoli went on to chastise Ms. Palmore and wrote, "[w]hy have you not followed these rules which all lawyers must follow in any firm, not just ours?"  Ms. Palmore could not even be granted the courtesy of reporting serious health conditions to her employer without being made to suffer harassment.

247.    Shortly thereafter, on February 15, 2023, while Ms. Palmore was on medical leave, she received an email from the Firm's Chief Financial Officer ("CFO") Lisa Tancredi.  In her email, Ms. Tancredi attached a "draw schedule" and further detailed "the outstanding balance due to the [F]irm is $400,770.38."  The Firm never once asked Ms. Palmore, who has worked at the Firm for over a year, for a pay back on any draw.

248.    Clearly, the Firm only interfered with her medical leave and engaged in this abhorrent conduct to further harass Ms. Palmore.

249.    Ms. Tancredi's email came just one day after Ms. Palmore submitted a supporting medical record to the Firm which confirmed she had gone to the hospital and suffered serious health conditions mere days earlier.

250.    Though the Firm was well aware of Ms. Palmore's ongoing and serious health conditions, it refused to accommodate her needs.  Instead, the Firm preyed on her weakened state, interfered with her medical leave and continued its onslaught of harassment and retaliation.

## X.     Mere Days Away from the Second Mediation Date, the Firm Files a Frivolous Lawsuit Against Ms. Palmore

251.     On February 23, 2023, only four days before a scheduled second mediation session, the Firm filed a baseless lawsuit against Ms. Palmore.  This is a shocking display of harassment and retaliation.

252.     Notably, the Firm filed its frivolous lawsuit a mere 10 days after Ms. Palmore submitted a corroborating medical record which substantiated her serious health conditions so that she could take medical leave.

253.     The crux of the Firm's lawsuit is the Firm's claim that Ms. Palmore attempted to extort money from the Firm by making "false and defamatory claims of discrimination" directed at her and others.

254.     As such, Defendants have admitted that the lawsuit was and is retaliation for Ms. Palmore's decision to speak out about her claims of discrimination, retain counsel and pursue her legal remedies.

255.     Despite the Firm's frivolous allegations, there is nothing defamatory about Ms. Palmore's claims of discrimination and retaliation, and as detailed herein, Ms. Palmore's claims are well-founded and entirely corroborated.

256.     In any event, the Napoli Preemptive Action did not even attempt to meet the heightened pleading standard required to maintain a defamation cause of action pursuant to N.Y. CPLR 3016(a).[10]

---

[10]     N.Y. CPLR 3016(a) states, "In an action for libel or slander, the particular words complained of shall be set forth in the complaint, but their application to the plaintiff may be stated generally."

257.    Throughout the Napoli Preemptive Action the Firm references "defamatory claims" and "defamatory statements" without ever particularizing what was said that it is alleging was defamatory as it must.

258.    It is abundantly clear that the Napoli Preemptive Action is merely a ploy to paint Ms. Palmore as a villain to the public without actually substantiating any of its asserted legal claims.

259.    And Ms. Palmore is hardly the only person to allege discrimination against the Firm.  She is one of many employees who have been discriminated against and bullied.

260.    Moreover, Ms. Palmore was never working for two firms at the same time as alleged in the Napoli Preemptive Action, and the only "evidence" of that is Ms. Palmore's social media profile that includes a reference to a firm, Palmore Law Group, P.C., which she operated for a brief period of time between working at her previous firm and this Firm.

261.    The Firm persecutes Ms. Palmore for a reference to the Palmore Law Group on her social media profile, yet it's Of Counsel, Steve Holihan, a white male, openly displays his law firm, Holihan & Associates, P.C., on his social media profile without penalty.  A Representative Example (from February 25, 2023) is shown here:



262.    To make matters worse, Mr. Napoli and Mr. Shkolnik have witnessed firsthand Ms. Palmore's reference to the Palmore Law Group on her social media profile well before the Firm filed its baseless lawsuit.

263.    Despite viewing her social media profile on multiple occasions, Mr. Napoli and Mr. Shkolnik never once raised the reference to the Palmore Law Group as an issue to Ms. Palmore.

264.    Not only did Mr. Napoli and Mr. Shkolnik view Ms. Palmore's social media profile, but several of the Firm's Partners—Mr. Napoli, Ms. Napoli and Mr. Shkolnik—have commented on posts of Ms. Palmore on a social media profile that referenced the Palmore Law Group.  Again, none of the Firm's Partners raised Ms. Palmore's reference to her law firm as an issue.

265.     Accordingly, any reference in the Firm's complaint to Ms. Palmore's formation of the Palmore Law Group, prior to her joining the Firm, as a basis for breach of fiduciary duty or breach of Employment Agreement is a red herring.  Ms. Palmore started the Palmore Law Group prior to joining the Firm.  It does not operate in any manner.  It has no active website.  It has no clients.

266.     The Firm also alleged that Ms. Palmore somehow quit and was disconnected from her job, when the Firm mandated at the end of the January 12, 2023 mediation that she not come to the office any longer and work from home until the next mediation session.

267.     The Firm also cannot assert a breach of fiduciary duty claim or breach of contract claim based on Ms. Palmore's supposed inability to generate the level of business the Firm expected.  Specifically, the Firm alleged that Ms. Palmore did not bring in the "hundreds of clients per year that she promised at the time of her hiring."

268.     As a matter of practicality, it would be absolutely ludicrous to expect one attorney to generate "hundreds" of cases per year.  Surely, there is no other senior attorney at the Firm who is held to the same unattainable standard as Ms. Palmore.

269.     Had the Firm expected Ms. Palmore to bring in hundreds of cases to the Firm within one year, not only would such performance be impossible, but pursuant to Ms. Palmore's Employment Agreement the Firm needed to file its action within 60 days of the accrual of its breach of contract claim (i.e. the one year point of her employment).[11]

270.     In its complaint, the Firm alleged that after three months of Ms. Palmore working the Firm became concerned because the "hundreds" of cases had not yet materialized.

---

[11]     Section 5.1 of the Employment Agreement states, "Partner/Of Counsel agrees that any claims under the contract or otherwise must be brought within 60 days after either accrual of a claim or termination of the agreement, whichever date comes first."

271.    Accordingly, by December 6, 2022 (one year from when her execution of the Employment Agreement), the Firm was on a 60-day clock to bring its action against Ms. Palmore.  It did not meet that deadline.

272.    Otherwise, had the Firm expected Ms. Palmore to generate hundreds of cases over a longer period of more than one year, that condition would have had to be written in Ms. Palmore's Employment Agreement pursuant to the New York Statute of Frauds, N.Y. Gen. Oblig. Law §5-701(a)(1).[12]  Nowhere in Ms. Palmore's Employment Agreement does it state she must bring in any required number of cases, let alone hundreds.

273.    Nonetheless, even with the lack of support and discriminatory treatment, in only slightly more than one year, Ms. Palmore has brought cases into the Firm that have an estimated value of approximately and at least between $12 and $20 million, with other cases in the investigation stage potentially worth many multiples of these figures.

274.    The Firm further asserted, although it is unclear how, that because Ms. Palmore allegedly did not pay back her draw through generated fees that she breached the Employment Agreement and owes the Firm hundreds of thousands of dollars out of her own pocket.

275.    Again, the Employment Agreement does not state anywhere therein that Ms. Palmore would be personally responsible for paying back any draw had not been covered by generated fees.[13]  Of course, Ms. Palmore does not owe the Firm anything.  The Firm is

---

[12]     Section 5–701(a)(1),the New York Statute of Frauds, provides, in relevant part: Every agreement, promise or undertaking is void, unless it ... be in writing ... if such agreement, promise or undertaking [b]y its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of the lifetime.

[13]     Section 2.3(a) of the Employment Agreement states, "The draw is to be paid back from fees as they are generated and carries over year to year."

attempting to hold Ms. Palmore liable for contractual conditions she never agreed to and only as an act of retaliation after she engaged in protected activity.

276.    The Napoli Preemptive Action also proposed that Ms. Palmore "took advantage" of a remote work environment, such a proposition is incredulous considering the provable fact that just one day after the Firm received a representation letter from Ms. Palmore's counsel, in October 2022, Ms. Palmore lost remote access to the Firm's network in its entirety and did not regain access until January 2023.

277.    The Firm also alleges that Ms. Palmore was an employee who had fiduciary obligations to the Firm and then "quit" her job.  But in other recent communications with Ms. Palmore, Defendants literally claimed she was not an employee and was instead an independent contractor.  The Firm keeps this as a moving target to fit their plans at any given time.

278.    In reality, the Firm's complaint is nothing more than brazen bullying and gamesmanship of the lowest level and abhorrent discrimination and retaliation.

## XI.    **The Firm Terminates Ms. Palmore**

279.    On Sunday, February 26, 2023, days after the Napoli Preemptive Action was filed, Paul Napoli emailed Ms. Palmore and told her she was fired.

280.    The Firm provided no legitimate basis for her termination, as none exists.

281.    Defendants' decision to fire Ms. Palmore also has the effect of cutting off her health insurance benefits at a time when she is dealing with serious medical conditions that require ongoing treatment and procedures.

282.    This was the culmination of an ongoing and coordinated plan to retaliate against and bully Ms. Palmore when she had the gall to raise complaints of discrimination.

**FIRST CAUSE OF ACTION**
**(Discrimination and Harassment in Violation of Section 1981)**

283.    Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs, as if set forth fully herein.

284.    By the actions described above, among others, Defendants have discriminated against Plaintiff because of her race in violation of Section 1981, including but not limited to, by denying her equal terms and conditions of employment and subjecting her to a hostile work environment.

285.    Through the conduct described above, Defendants have discriminated against Plaintiff on the basis of her race in violation of Section 1981 by fostering, condoning, accepting, ratifying, and/or otherwise failing to prevent or to remedy a hostile work environment.

286.    As a direct and proximate result of Defendants unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and non-monetary harm or which she is entitled to an award of damages.

287.     Defendants unlawful and discriminatory actions constitute intentional, malicious, willful, wanton and/or reckless violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

288.    The individual Defendants aided, abetted and actually participated in the unlawful conduct described herein.

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of Section 1981)**

289.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

290.    By the actions described above, among others, Defendants have retaliated against Plaintiff because of her engagement in protected activities in violation of Section 1981, including but not limited to, by denying her equal terms and conditions of employment and subjecting her to a hostile work environment.

291.    Through the conduct described above, Defendants have retaliated against Plaintiff on the basis of her engagement in protected activities in violation of Section 1981 by fostering, condoning, accepting, ratifying, and/or otherwise failing to prevent or to remedy a hostile work environment.

292.    As a direct and proximate result of Defendants unlawful retaliatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and non-monetary harm for which she is entitled to an award of damages.

293.    Defendants unlawful and retaliatory actions constitute intentional, malicious, willful, wanton and/or reckless violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

294.    The individual Defendants aided, abetted and actually participated in the unlawful conduct described herein.

### THIRD CAUSE OF ACTION
**(Discrimination and Harassment in Violation of the NYSHRL)**

295.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

296.    By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her race and disability in violation of the NYSHRL and/or subjected her to a hostile work environment.

297.     As a direct and proximate result of Defendants unlawful discriminatory conduct and harassment in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and non-monetary harm for which she is entitled to an award of damages.

298.     Defendants unlawful and discriminatory actions constitute intentional, malicious, willful, wanton and/or reckless violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

299.     The individual Defendants aided, abetted and actually participated in the unlawful conduct described herein.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)

300.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

301.     By the actions described above, among others, Defendant retaliated against Plaintiff on the basis of her engagement in protected activities in violation of the NYSHRL.

302.     As a direct and proximate result of Defendants unlawful retaliatory conduct in violation of the NYSHRL Plaintiff has suffered, and continues to suffer, monetary and non-monetary harm for which she is entitled to an award of damages.

303.     Defendants unlawful and retaliatory actions constitute intentional, malicious, willful, wanton and/or reckless violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

304.     The individual Defendants aided, abetted and actually participated in the unlawful conduct described herein.

## FIFTH CAUSE OF ACTION
### (Discrimination and Harassment in Violation of the NYCHRL)

305.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

306.     By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her race and disability in violation of the NYCHRL and/or subjected her to a hostile work environment.

307.     As a direct and proximate result of Defendants unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

308.     As a direct and proximate result of Defendants unlawful discriminatory conduct and harassment in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and non-monetary harm for which she is entitled to an award of damages.

309.     Defendants unlawful and discriminatory actions constitute intentional, malicious, willful, wanton and/or reckless violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

310.     The individual Defendants aided, abetted and actually participated in the unlawful conduct described herein.

## SIXTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)

311.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

312.     By the actions described above, among others, Defendant retaliated against Plaintiff on the basis of her engagement in protected activities in violation of the NYCHRL.

313.     As a direct and proximate result of Defendants unlawful retaliatory conduct in violation of the NYCHRL Plaintiff has suffered, and continues to suffer, monetary and non-monetary harm for which she is entitled to an award of damages.

314.     Defendants unlawful and retaliatory actions constitute intentional, malicious, willful, wanton and/or reckless violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

315.     The individual Defendants aided, abetted and actually participated in the unlawful conduct described herein.

<u>**SEVENTH CAUSE OF ACTION**</u>
**(Interference in Violation of the FMLA)**

316.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

317.     By the actions described above, among others, Defendants unlawfully interfered with Plaintiff's rights under the FMLA.

318.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages and other relief.

319.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered non-monetary loss including severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

320.     Plaintiff is also entitled to liquidated damages and recovery of all attorney's fees and expenses.

321.     The individual Defendants aided, abetted and actually participated in the unlawful conduct described herein.

## EIGHTH CAUSE OF ACTION
### (Retaliation in Violation of the FMLA)

322.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

323.    By the actions described above, Defendants retaliated against Plaintiff for exercising her FMLA rights.

324.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages and other relief.

325.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered non-monetary loss including severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

326.    Plaintiff is also entitled to liquidated damages and recovery of all attorney's fees and expenses.

327.    The individual Defendants aided, abetted and actually participated in the unlawful conduct described herein.

## NINTH CAUSE OF ACTION
### (Violation of the New York Anti-SLAPP Law)

328.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

329.    By the actions described above, Defendants violated the New York Anti-SLAPP Law by filing an action against Plaintiff "involving [her engagement in] public petition and participation."

330.    Plaintiff's conduct was in furtherance of and connected to an issue of "public interest."

331.    Defendants' conduct in commencing an action against Plaintiff was intended to and did harass, intimidate, punish and/or otherwise maliciously inhibit protected conduct.

332.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages and other relief.

333.    Plaintiff also seeks punitive damages and recovery of attorney's fees and costs.

334.    The individual Defendants aided, abetted and actually participated in the unlawful conduct described herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, through the following relief:

A.    A declaratory judgment that the actions of Defendants complained of herein violate the laws of the United States and the State of New York;

B.    An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings;

D.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, emotional pain and suffering and emotional distress;

E.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

F.    An award of punitive damages in an amount to be determined at trial;

G.    An award of liquidated damages, in an amount to be determined at trial;

H.    An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

I.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  February 27, 2023
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____

David E. Gottlieb
Kassandra Vazquez

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dgottlieb@wigdorlaw.com
kvazquez@wigdorlaw.com

*Counsel for Plaintiff*